UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | CAUSE NUMBER 3:09-CR-00065RM |
| | ) | |
| ROBERTO COLON-ARENAS (01) and | ) | |
| ISAAC VEGA GERARDO (02) | ) | |

<u>OPINION AND ORDER</u>

On August 24, the court heard evidence and argument on the defendants' motions to quash arrest and suppress evidence. For the reasons that follow, the court denies the defendants' motions.

I.

A.

On June 2, 2009 Roberto Colon-Arenas was instructed to drive a white 2005 Chevrolet Monte Carlo from Philadelphia to Chicago, to pick up what he expected to be a large quantity of an unknown type of drug, and back. Mr. Colon-Arenas was to drive the car because he had a valid driver's license and his companion, Isaac Vega-Gerardo, did not. Not wanting to be stopped by police in his travels, Mr. Colon-Arenas had the Monte Carlo inspected at a garage in Philadelphia. The Monte Carlo passed inspection and was issued inspection stickers. Mr. Colon-Arenas's own walkaround showed that all the lights were working, including the light over the license plate.

Mr. Colon-Arenas and Mr. Vega-Gerardo set off from Philadelphia some time toward dark on June 2. They drove to Chicago — the testimony is unclear whether Mr. Colon-Arenas did all the driving or only some, but it appears certain he did most of it. They stopped at a McDonald's in Chicago. Mr. Colon-Arenas got out of the car and Mr. Vega-Gerardo drove off. Mr. Vega-Gerardo returned about 45 minutes later, Mr. Colon-Arenas got back in the driver's seat, and they headed east, mostly, for Philadelphia. By this point, it was June 3.

B.

In the waning minutes of June 3, Marshall County Patrolman Nicholas Laffoon was on routine patrol in a marked car on U.S. 30. He was heading westbound, nearing the western border of his county, and was slowing to turn back in the other direction when he saw the eastbound Monte Carlo carrying Mr. Colon-Arenas and Mr. Vega-Gerardo. Patrolman Laffoon first noticed that the Monte Carlo's interior dome light was on. Patrolman Laffoon saw the light go off and the Monte Carlo swerve within its lane. Patrolman Laffoon explained at the suppression hearing that he often encounters fatigued or impaired drivers because he works the midnight shift. He noted in his side mirror that the Monte Carlo's license plate light was out.

Patrolman Laffoon turned eastbound and pursued the Monte Carlo. He watched it weave within its lane another two or three times. The Monte Carlo driver apparently noticed Patrolman Laffoon's car just before Patrolman Laffoon

activated his overhead lights, because the Monte Carlo braked suddenly in the passing lane, causing Patrolman Laffoon to brake as well. Both vehicles soon came to a stop. Patrolman Laffoon radioed the dispatch center at 11:45 p.m. that he had conducted a traffic stop.

Patrolman Laffoon approached the car and asked the driver for his driver's license and registration. Mr. Colon-Arenas handed Patrolman Laffoon his Pennsylvania driver's license and the Pennsylvania registration for the vehicle. The Monte Carlo wasn't registered in either occupant's name.

When he leaned toward the driver window to get the paperwork, Patrolman Laffoon noticed a strong air freshener odor. Based on his training, Patrolman Laffoon (who had been with the Marshall County Police since 2000, and since 2005 as an officer), had learned that air freshener can be used to cover the odor of narcotics. Patrolman Laffoon saw several air fresheners, an Atlas, maps, fast food containers, energy drink bottles, several cell phones and a GPS device in the car.

Mr. Colon-Arenas looked very fatigued to Patrolman Laffoon. Patrolman Laffoon asked Mr. Colon-Arenas where he was going, and Mr. Colon-Arenas said they were going to Philadelphia. Patrolman Laffoon asked where he was coming from; Mr. Colon-Arenas said he was coming from Illinois. When Patrolman Laffoon asked where in Illinois, Mr. Colon-Arenas said nothing for some 15 seconds. Patrolman Laffoon tried to speak with the passenger, but Mr. Vega-Gerardo did

3

not appear to (and does not in fact) speak English. Patrolman Laffoon returned to his police car with Mr. Colon-Arenas's license and the Monte Carlo's registration.

At 11:48 p.m., Patrolman Laffoon asked the dispatch center for a license check on Mr. Colon-Arenas and also requested a K-9 officer. At 11:49 Patrolman Laffoon learned from dispatch that K-9 officer Rick Kanaar was en route; a minute later, Officer Brouyette radioed that he, too, was en route. At 11:51, the dispatch center gave Patrolman Laffoon the okay on Mr. Colon-Arenas's drivers license, and Patrolman Laffoon began writing a warning ticket for improper equipment (the disabled light over the license plate). *See* IND. CODE 9-19-6-4(e). Officer Brouyette arrived at the scene at 11:54. Patrolman Laffoon stopped preparing the warning ticket when Officer Kanaar arrived with his police dog at 11:57.

Officer Kanaar has been with the Marshall County Sheriff's Department since 2000. He got his dog (then about a year old) in 2001 through Vohne Liche Kennels in Denver, Indiana. Indiana has no police academy for K9 units. Officer Kanaar and the dog went through a five-week training course with Vohne Liche Kennels, at the end of which both were certified. Their certifications were renewed in the Decembers of 2002, 2003, 2004, 2005, and 2006. After that, Marshall County fiscal issues led to no more trips to Denver, Indiana for recertification. Officer Kanaar was certified as a handler, not a trainer, but continues to train the dog formally for eight hours a month, and for shorter periods each day that are not logged. The dog was trained in narcotics detection, apprehension, and tracking.

Officer Kanaar spoke with Patrolman Laffoon to find out what was going on, then approached the Monte Carlo with the dog. Officer Kanaar tried to explain to the car's occupants what he was about to do, but he, too, found himself unable to communicate with Mr. Vega-Gerardo. Officer Kanaar led the dog around the Monte Carlo and the dog twice indicated the presence of narcotics. Officer Kanaar returned the dog to the squad car and told Patrolman Laffoon that the dog had alerted. Patrolman Laffoon had Mr. Colon-Arenas and Mr. Vega-Gerardo get out of the Monte Carlo and stand at the rear of the car with Officer Kanaar while Patrolman Laffoon searched the interior of the Monte Carlo. At 12:03 a.m., Officer Kanaar reported to the dispatch center that the dog had made a positive indication and that the search was underway.

Patrolman Laffoon found false panels in the front doors; one of the panels contained three packages of heroin wrapped in black electric tape. Mr. Colon-Arenas and Mr. Vega-Gerardo were placed under arrest and ultimately taken to a Marshall County holding facility where they were fingerprinted and questioned. An inventory search disclosed a noteworthy amount of cash on Mr. Vega-Gerardo, who also made a statement to police.

A grand jury indicted both Mr. Colon-Arenas and Mr. Vega-Gerardo for knowingly and intentionally possessing with intent to distribute a mixture or substance containing heroin in violation of 21 U.S.C. § 841(a)(1).

II.

Mr. Colon-Arenas and Mr. Vega-Gerardo both move to suppress. Mr. Colon-Arenas says the heroin should be supressed because (1) the traffic stop was without probable cause; (2) the eighteen minutes between the beginning of the stop and the dog's indication of the presence of drugs was unreasonably long; and (3) the dog's training and reliability were not shown to be sufficient. Mr. Vega-Gerardo argues that his detention was unlawful, so his post-arrest statements must be suppressed. The thrust of his argument is that he was a mere passenger in the car and that officers had no probable cause to arrest him when they found heroin in a hidden compartment in the car.

A.

Before the court turns to the legal arguments, some explanation of the foregoing findings is needed. First, the court conducted a single suppression hearing on both motions. The court indicated that it would view all evidence as applicable to both motions unless a party indicated it did not wish certain evidence to apply to that party. As Mr. Colon-Arenas testified to the events in Pennsylvania before this stop, counsel for Mr. Vega-Gerardo told the court that he didn't wish Mr. Colon-Arenas's testimony to be considered against Mr. Vega-Gerardo; the government didn't object to that request, so the court considers Mr. Colon-Arenas's testimony only on Mr. Colon-Arenas's motion. The facts in part I-A of this opinion address Mr. Colon-Arenas's motion alone.

Mr. Colon-Arenas's testimony was both inculpatory and very credible. He seemed to tell the truth to the best of his ability and recollection. Mr. Colon-Arenas's testimony varied from Patrolman Laffoon's testimony on some key points, and Patrolman Laffoon, too, was a very credible witness. The two principal topics of divergence relate to whether the license plate light was operating and what Patrolman Laffoon told Mr. Colon-Arenas about the reason for the stop. The court credits Patrolman Laffoon's testimony over Mr. Colon-Arenas's testimony on those points, for a few reasons.

First, Mr. Colon-Arenas couldn't (and to his credit, didn't) testify that the license plate light was working when the Monte Carlo passed Patrolman Laffoon's squad car. Mr. Colon-Arenas testified that the light was working before that (when the Monte Carlo was inspected at the Philadelphia garage and when Mr. Colon-Arenas himself looked it over on June 2), but didn't testify that he saw it shining when he and Mr. Vega-Gerardo were shunted to the rear of the car during the search. It is most unlikely that Mr. Colon-Arenas would have noticed when the light was on or off, since the rear of the Monte Carlo was lighted brightly by Patrolman Laffoon's squad car's headlights.

Mr. Colon-Arenas might well have looked specifically at the license plate light had he understood that the light was among the reasons he was pulled over. Mr. Colon-Arenas testified that he asked Patrolman Laffoon why they had been pulled over, and that Patrolman Laffoon asked why the interior dome light had been on. Mr. Colon-Arenas also understood Patrolman Laffoon to have said, when

7

the men were being removed from the car, that the interior light was the reason for the stop. English isn't Mr. Colon-Arenas's first language, though. He used a Spanish interpreter at the suppression hearing, and the court has no yardstick by which to measure Mr. Colon-Arenas's understanding of English.

The risk of misunderstanding would have been heightened by Mr. Colon-Arenas's fatigue. Patrolman Laffoon testified that Mr. Colon-Arenas appeared to be very tired — and years working the midnight shift on traffic patrol lend greater weight to Patrolman Laffoon's opinion. Mr. Colon-Arenas had driven from Philadelphia to Chicago (perhaps with a little help from Mr. Vega-Gerardo), been at a fast food restaurant for less than an hour, and immediately set off on the return trip. Mr. Colon-Arenas said he had gotten lost on the way back. Although the interior light was what first called Patrolman Laffoon's attention to the Monte Carlo, nothing other than Mr. Colon-Arenas's testimony suggests that the interior light — rather than license plate light or concern about Mr. Colon-Arenas's weaving as he drove — was the reason for the stop. Notwithstanding Mr. Colon-Arenas's general credibility as a witness, Mr. Colon-Arenas's recollection of what was told to him in his second language when he was very tired and apprehensive of the police finding the drugs he knew to be in the car doesn't persuade the court.

The court hastens to add, lest it be misunderstood, that this reasoning is not based on any disrespect toward persons whose first language isn't English or who use an interpreter to increase the likelihood of understanding proceedings of the deepest gravity. All witnesses enter the courtroom with an equal right to be

found credible and accurate. As already has been noted, Mr. Colon-Arenas impressed the court with his attempts to be as forthcoming as he could. Even given those attempts (and even with an interpreter), he seemed to be confused at times about when and whether Mr. Vega-Gerardo might have driven on their trip and when drugs were and weren't in the car. The court is faced with conflicting testimony from two very credible witnesses, and no disrespect should be seen in the court's effort to find an explanation for differing perceptions and recollections.

Mr. Colon-Arenas presented other evidence that might allow an inference that the license plate light was working at the time of the stop, which would defeat any argument that probable cause existed for the stop. Mr. Colon-Arenas's attorney procured a court order to allow an investigator to examine and photograph the Monte Carlo, now in possession of the United States Marshals. When the investigator produced tools with which he intended to remove the plastic cover to get a look at the light bulb, agents balked, saying there is a difference between inspecting the car and photographing the car on the one hand, and disassembling it on the other. Mr. Colon-Arenas suggests that if the agents had nothing to hide, they would have allowed the cover to be removed.

That inference is permissible, but too weak for the court to draw. The court order on which the investigator relied ordered the Marshals Service to "allow defense counsel and his investigator access to the vehicle for inspection and photography." Reasonable minds can differ as to whether "inspection" extends to removing parts from the vehicle. Affording a reasonable interpretation (even if not

9

the only reasonable interpretation) to a court order is a poor foundation from which to infer that law enforcement agents had tampered with the vehicle to disable the license plate light. Mr. Colon-Arenas's investigator testified that the license plate light wasn't working when he looked at the Monte Carlo; the court finds that it wasn't working when Patrolman Laffoon first saw the license plate in his side view mirror.

In his brief, Mr. Colon-Arenas also argued that Patrolman Laffoon was able to read the license plate because he radioed the plate into dispatch before stopping the Monte Carlo. Again, one might infer that the officer's ability to read the plate meant the light was working. But Patrolman Laffoon was following the Monte Carlo, and it is no less reasonable an inference that the light was lighted adequately by the squad car's headlights.

For all these reasons, the court finds that the Monte Carlo's license plate light was not working.

B.

That finding dooms Mr. Colon-Arenas's first argument for suppression, in which he claims there was no traffic violation and so no probable cause to pull him over, meaning that the heroin found during the traffic stop should be suppressed. An officer's decision to stop an automobile generally is reasonable when the police have probable cause to believe that a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). The traffic offense

might be minor, United States v. Muriel, 418 F.3d 720, 724 (7th Cir. 2005), but as long as the officer's belief that a traffic law has been violated is objectively reasonable, there is probable cause to make a traffic stop. Schor v. City of Chicago, No. 08-2837, 2009 WL 2461392, at *2 (7th Cir. Aug. 13, 2009); United States v. Dowthard, 500 F.3d 567, 569 (7th Cir. 2007). The Monte Carlo's license plate was out, and so was in violation of IND. CODE 9-19-6-4(e), and Patrolman Laffoon observed that violation when the Monte Carlo went past him. Probable cause existed to stop the Monte Carlo for the equipment violation.

Mr. Colon-Arenas next argues that Patrolman Laffoon extended the stop longer than necessary so that Officer Kanaar could get the drug dog to the scene. A seizure that is lawful at its inception can violate the Fourth Amendment if it becomes unreasonable during its execution. Illinois v. Caballes, 543 U.S. 405, 407 (2005). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful it if is prolonged beyond the time reasonably required to complete that mission." Id. The Caballes Court cited with approval People v. Cox, 782 N.E.2d 275, 279 (Ill. 2002), *overruled by* People v. Bew, 886 N.E.2d 1002 (Ill. 2008) on other grounds pursuant to Caballes, which held that dog sniffs without meeting any threshold standard are constitutional because of a lack of privacy interest in contraband. Illinois v. Caballes, 543 U.S. at 409. The Cox court stated that if no further suspicion is aroused after an officer makes inquiries into the suspected traffic violation, the traffic stop must go no further. People v. Cox, 782 N.E.2d at 279. The Cox court also found that a stop lasting

11

fifteen minutes to issue a ticket for a missing rear license plate light, so as to accommodate a dog sniff, was unreasonably long. Id. at 280. In Cox, the officer provided no reason for having called a dog sniff in the first place. Id.

An officer's experience may arouse suspicion that a vehicle contains drugs when there is the heavy odor of air freshener, a cellular phone, nervous occupants, and fast-food wrappers strewn around the car. *See* United States v. Patterson, 65 F.3d 68, 71 (7th Cir. 1995). Still, Mr. Colon-Arenas argues that the overall eighteen-minute duration was unreasonable under Illinois v. Caballes, relying heavily on language in United States v. Garrett, 139 Fed.Appx. 720, 723 (7th Cir. 2005), to the effect that "if Cade alerted within 5 or 10 minutes of Garrett being pulled over, that would likely be a reasonable amount of time for McDonald to still be responding to the traffic violation. But if the alert happened 19 minutes into the stop, perhaps not." Having been in a stop that reached just short of the time the Garrett court said might be unreasonable, Mr. Colon-Arenas argues that his stop was prolonged unreasonably. He contends that Patrolman Laffoon stalled things out so the dog could arrive. The record belies that argument.

Mr. Colon-Arenas's investigator testified that when he was a state trooper twenty-eight years earlier, it would take him about five minutes to write a warning ticket for an equipment violation (what the investigator called a "notice to repair") if nothing else was going on. The investigator added that he doesn't know what forms are in use today, and that he generally would start writing before getting word from dispatcher on the driver's license check.

The time pertinent to analysis of this stop began at 11:48, when Patrolman Laffoon radioed in the license check and the request for the drug dog. The dispatch center responded with the license information at 11:51. Although the defense investigator used to begin writing warning tickets without waiting for license information, nothing in this record indicates that most officers do so, or allows even a guess as to what most officers do. To determine whether the length of a stop is objectively unreasonable because of a stall for the drug dog, then, the time allotted to writing the warning ticket commences at 11:51, when Patrolman Laffoon received the last piece of necessary information.

The defense investigator testified that it used to take him five minutes to write the ticket if nothing else was going on. Patrolman Laffoon testified that there were other things going on. No one asked him what those things might have been, but the dispatch reports indicate that Office Brouyette arrived on the scene at 11:54 — three minutes after Patrolman Laffoon received the license information. The court has no basis to say that it would have been objectively unreasonable for Patrolman Laffoon to interrupt the ticket-writing to bring the other responding officer up to speed. Officer Kanaar arrived three minutes later — six minutes after Patrolman Laffoon received the license information, and well within the defense investigator's five-minutes-if-nothing-else-is-happening time frame. Within six minutes of Officer Kanaar's arrival, the occupants were out of car and the Monte Carlo was being searched.

The length of time between the stop of the Monte Carlo to the time Officer Kanaar's dog alerted (an event that provided a new justification to keep everyone there, *see* Florida v. Royer, 460 U.S. 491, 506 (1983)), was not so prolonged as to be objectively unreasonable.

The strongest of Mr. Colon-Arenas's three arguments relates to the dog. The government must establish a drug detection dog's reliability and training following a warrantless search. United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980). This case differs from others the parties cite because the dog received regular training and recertifications for a period of years — 2001-2006 — but hadn't been recertified, or received training from a certified trainer, for thirty months before alerting on the Monte Carlo.

Mr. Colon-Arenas argues by analogy to chemical breath tests. If a Breathalyzer or its operator have not been certified within a specified period of time, they are inadmissible in evidence. *See, e.g.,* IND. CODE 9-30-6-5. Upon closer consideration, though, Breathalyzer results and the evidence at issue here are not analogous. First, chemical breath tests are used to prove a defendant's guilt of a crime beyond a reasonable doubt, and so must meet an especially high level of reliability lest juries bow to what appears to be scientific evidence. This dog's alert, on the other hand, combined with Patrolman Laffoon's observations of the items in the Monte Carlo — especially the air fresheners — to provide probable cause to believe illegal drugs were in the car. Probable cause consists of known facts and circumstances sufficient to warrant a reasonably prudent man in the belief that

contraband will be found, United States v. Alexander, 573 F.3d 465, 476 (7th Cir. 2009), which is a long way from proof beyond a reasonable doubt.

Second, chemical breath tests are closely regulated by state statutes and, in Indiana, by standards provided by the head of the Indiana University Department of Toxicology. IND. CODE 9-30-6-5(a). Indiana law does not provide any standards for certification of narcotics-detecting dogs.

Notwithstanding that chemical breath tests provide an imperfect analogy, it remains that in this case, as in the drunk driving case, the prosecution must present satisfactory evidence that the dog produces reliable results. The record before the court is a thin one on which to make such a finding.

Nothing in this record allows the court to know how frequently professionals recommend refresher training and/or recertification. The record indicates that Vohne Liche Kennels, the private company that trained Officer Kanaar and his dog, recommends that those things be done annually, but there is no way to know whether annual refreshers are the minimum needed for a dog to retain its training, or a convenient span that forecloses any chance that the dog will fall back or that assures handlers will know the latest information, or even a time period that allows optimal income to the private provider.

The record discloses that this dog and handler were well-trained. They underwent a five-week training period together, and five subsequent two-day sessions that each provided fifteen hours of training. Although that training ended thirty months before the Monte Carlo search, Officer Kanaar continued to provide

15

the dog with eight hours of training per month. Officer Kanaar isn't a certified trainer, but it is reasonable to infer he learned something about how to train his dogs in the sessions in Denver.

Most importantly, Officer Kanaar testified that he has found his dog to be reliable at detecting narcotics. That is, after all, the bottom line when it comes to evaluating information on which probable cause was found. *See, e.g.*, United States v. Limares, 269 F.3d 794, 798 (2001) ("The affidavits in support of the two warrants said that Wendy is reliable, and the evidentiary hearing proved that out: even if all alerts to currency are treated as false positives, Wendy has been right 62% of the time, enough to prevail on a preponderance of the evidence, and 'probable cause' is something less than a preponderance."); United States v. Klein, 626 F.3d 22, 27 (7th Cir. 1980) ("We find sufficient, however, the affiant's representation to the magistrate that the dog 'graduated from a training class in drug detection in October 1978' and 'has proven reliable in detecting drugs and narcotics on prior occasions.'"); *see also* United States v. Garrett, 139 Fed. Appx. 720, 724 (7th Cir. 2005) ("Garrett's argument is squarely rebutted by the report. Cade's certification in a training school and 100-percent accuracy in a recent proficiency examination supports the district court's conclusion that Cade's alert was reliable.").

At bottom, then, this case involves an alert by a highly trained narcotics detection dog who has been reliable in the past. Were the standard higher than probable cause, or if the dog's alert provided the only basis for belief that drugs

16

were in the Monte Carlo, the lack of recent recertification (and lack of evidence about just what the lack of recertification means) and more specific reports than "has been reliable in the past" might defeat use of the dog's alert. Under the circumstances of this case, though, the government's showing is minimally sufficient.

Probable cause existed to stop the Monte Carlo, the stop was not unreasonably prolonged, and the dog was sufficiently reliable to contribute to probable cause to believe the Monte Carlo contained drugs. The court denies Mr. Colon-Arenas's motion to suppress.

C.

Mr. Vega-Gerardo's argument differs from those of Mr. Colon-Arenas. He argues that his detention was unlawful, so evidence seized and statements made after arrest must be suppressed. He says he was just a passenger in the Monte Carlo and that officers had no probable cause to arrest him when they found heroin in the hidden compartment in the car. Mr. Vega-Gerardo says there was no particularized suspicion that he was committing, or was about to commit, a crime. Mere proximity to someone suspected of the crime (in this case, Mr. Colon-Arenas) without some additional indication of his involvement in that crime is insufficient to support a finding of probable cause. *See* Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

17

Mr. Vega-Gerardo is correct insofar as he contends that he did and said nothing at the scene to support an arrest. When directed to get out of the car, Mr. Vega-Gerardo was patted down for weapons. He had a cell phone, but no contraband or other indication of illegal activities. But Mr. Vega-Gerardo's arrest didn't flow from anything he did when stopped.

Patrolman Laffoon didn't independently suspect Mr. Colon-Arenas of a crime when he found heroin hidden in the car; he suspected both occupants of the Monte Carlo of transporting contraband. Mr. Vega-Gerardo is correct that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person" and that where "the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." Ybarra v. Illinois, 444 U.S. 85, 91 (1979). Mere proximity to a person suspected of committing a crime doesn't provide probable cause to search or arrest an innocent bystander. *See* id.; *see also* United States v. Ingrao, 897 F.2d 860, 863 (7th Cir. 1990) ("Clearly physical proximity to a suspected crime, without other indicia of [the defendant's] involvement, is insufficient to support a finding of probable cause.").

The facts of Ybarra and Ingrao help explain what is meant by independent suspicion. The Ybarra Court found that suspicion that a bartender is engaged in criminal activity provides no basis to suspect criminal activity on the part of patrons of the bar where the bartender works. *See* Ybarra v. Illinois, 444 U.S. at

18

92-93. In United States v. Ingrao, the court of appeals found that the actions of a defendant who carried a bag down a common gangway, away from, but not necessarily directly out of, a suspected criminal's dwelling, weren't sufficient to constitute probable cause that he was committing or about to commit a crime since, without more, these could be completely innocent actions. *See* United States v. Ingrao, 897 F.2d at 865.

Officers have probable cause to make a warrantless arrest when information is sufficient to justify a prudent person in believing that a person has committed, or is committing, a crime. United States v. Breit, 429 F.3d 725, 728 (7th Cir. 2005). Probable cause is based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest. Id.

Mr. Vega-Gerardo wasn't a mere bystander, and wasn't arrested based on guilt by proximity or association. Patrolman Laffoon didn't suspect (and had no basis for suspecting) that the driver alone was transporting contraband. It was reasonable for Patrolman Laffoon to suspect Mr Colon-Arenas and Mr. Vega-Gerardo jointly of transporting the heroin; it was reasonable to think it wasn't mere chance that placed these two men together in the middle of rural Indiana, on a long overnight trip to Pennsylvania, in a car that was registered to neither occupant but containing three packages of heroin. Someone was responsible for the contraband, and it was reasonable to suspect Mr. Vega-Gerardo of being partly, if not entirely, responsible. *See* Fernandez v. Perez, 937 F.2d 368, 370 (7th Cir. 1991) (finding probable cause to arrest vehicle's passenger when police found

19

a handgun with metal-piercing bullets in the trunk of the car and metal-piercing bullets were found on the person of a different passenger).

The discovery of the heroin gave the officers who were present probable cause to arrest both of the occupants of the Monte Carlo. Because they had probable cause to arrest Mr. Vega-Gerardo, his motion to suppress must be denied.

III.

For the foregoing reasons, the court DENIES defendant Mr. Vega-Gerardo's motion to quash arrest and suppress evidence (doc. 20) and defendant Mr. Colon-Arenas's motion to quash arrest and suppress evidence (doc. 21). Because those motions formed the only objection to the government's petition to require the defendants to furnish palm prints, fingerprints, and DNA samples (doc. 27), the court GRANTS that petition.

SO ORDERED.

ENTERED:   August 25, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court